PATHMAN CONSTRUCTION COMPANY AND PATHMAN CONSTRUC-
TION CORPORATION OF INDIANA AND THE HOME INDEMNITY
COMPANY *v.* KNOX COUNTY HOSPITAL ASSOCIATION AND THE
GOVERNING BOARD OF KNOX COUNTY HOSPITAL.

[No. 1-474A60.  Filed May 5, 1975.]

*Trockman, Flynn, Swan & Tyler,* of Evansville, for appellants.

*J. Lloyd Fitzpatrick,* of Washington, *Robert P. Johnstone, Barnes, Hickam, Pantzer & Boyd,* of counsel, of Indianapolis, for appellees.

LOWDERMILK, J.—This is an appeal from a judgment declaring an arbitration provision null and void, and enjoining any further action to enforce said provision.

The pertinent facts establish that on August 14, 1968, plaintiffs-appellees, Knox County Hospital Association and the Governing Board of Knox County Hospital (hereinafter collectively referred to as "Hospital" unless otherwise indicated respectively as "Association" or "Board"), and defendants-appellants, Pathman Construction Company (Company), an Illinois corporation, entered into a construction contract for the building and remodelling of the Good Samaritan Hospital in Vincennes, Indiana, which contract was for $3,767,000.

Subsequently, on April 5, 1972, the contract was assigned to Pathman Construction Corporation of Indiana (Pathman). Numerous subcontractors were employed and among these were included several out-of-state companies and some out-of-state employees. The dollar value of the out-of-state contracts totalled over $700,000 and included such items as cabinets and such major components as structural steel and windows to be included in the hospital.

The contract between the parties included an arbitration clause which, in pertinent part, is as follows:

"7. Arbitration.— (a) It is mutually agreed that all disputes arising in connection with this contract shall be submitted to arbitration in accordance with the provisions of the current Standard Form of Arbitration Procedure of the American Institute of Architects and that all findings of fact by the arbitrators under this agreement shall be conclusive and binding on both parties. It is further mutually agreed that the decision of the arbitrators shall be a prior condition to any right of legal action which either party to the contract may have against the other.

(b) The work under this contract shall not be stopped or delayed in any way during the arbitration proceedings except by written mutual consent of both parties to the contract, and such mutual consent shall stipulate whether extension of the time for completion of the contract will be authorized by such stoppage or delay.

(c) Demand for arbitration in connection with any dispute shall be filed in writing with the Architect and with the other party to the contract. Any demand for arbitration shall be made within thirty days after the dispute has arisen

if practicable, but, in any event, no demand for arbitration shall be made after the date of final payment except in the case of a dispute arising in connection with any guarantee provisions of the Contract Documents.

(d) The arbitrators hereunder shall have authority to award to the party whose contentions are approved as being in conformity with contract requirements such sums as they, or a majority of them, consider is proper to compensate the injured party for any loss in connection with the proceedings; and, if they find that the arbitration proceedings were demanded without reasonable cause, they may in addition award the injured party damages for delay, unless precluded by agreement between the contracting parties before arbitration. . . ."

In 1972 various disputes arose between the parties and Hospital filed a demand for arbitration under Paragraph 7(c) of the contract, with regard to the removal and patching of certain walls, the lack of temporary heat, unlevel floors and water leakage. Thereafter, Pathman demanded arbitration with regard to certain other disputes. The problems were submitted for arbitration and an award was made April 9, 1973.

In October of 1973 further problems between the parties developed and Pathman then demanded arbitration pursuant to the contract. At this time Hospital filed its complaint, asking that the arbitration provision in the contract be declared void, and seeking a temporary restraining order, a preliminary injunction, and a permanent injunction prohibiting Pathman from attempting to use said arbitration provision. A temporary restraining order was issued October 19, 1973, and on November 6, 1973, the trial court held that the restraining order would remain in force throughout the trial.

Trial of the matter was concluded on December 11, 1973, and on January 4, 1974, the trial court made its entry and judgment, declaring the arbitration provision null and void and enjoining Pathman from any further action to enforce said provision. In making this judgment the trial court specifically found that ". . . plaintiffs lacked the capacity to enter into such an agreement when the contract was executed in 1968 . . ."

This appeal follows the trial court's overruling of Pathman's motion to correct errors.

In this appeal Pathman raises three separate arguments.

1. That Hospital has waived the right to question the arbitration clause because of its participation in the previous arbitration proceedings.

Pathman further argues that Hospital is not entitled to the equitable relief of injunction because it enters the court with unclean hands.

2. That the Indiana Rules of Procedure, Trial Rule 38(E) nullifies prior law declaring agreements to arbitrate void by stating:

> "(E) Arbitration. Nothing in these rules shall deny the parties the right by contract or agreement to submit or to agree to submit controversies to arbitration made before or after commencement of an action thereon or deny the courts power to specifically enforce such agreements."

In this same argument Pathman contends that the Uniform Arbitration Act, passed in Indiana in 1969 (IC 1971, 34-4-2-1 to 34-4-2-22 (Burns Code Ed.)) indicates an intent to revoke any prior case law declaring arbitration of future disputes contrary to public policy.

Finally, Pathman argues in this respect that since arbitration is merely remedial and procedural, any acts relating thereto should be retroactive.

3. That the contract between the parties involves interstate commerce and is subject to the United States Arbitration Act, found at 9 U.S.C.A. § 1, *et seq.* Pathman contends this is a body of federal substantive law which pre-empts the field of arbitration under the circumstances here involved.

## I.

We first deal with Pathman's arguments that TR. 38(E) and/or the Indiana Uniform Arbitration Act of 1969 serve to validate the arbitration clause.

We would agree with Pathman that there are at least two situations where an act may have retroactive effect. First, where it is necessary to carry out the purpose of the law, and, second, where a *remedy* alone is provided, and no new *rights* are given or existing ones removed. See *Herrick* v. *Sayler* (7th Cir. 1957), 245 F.2d 171; *Malone* v. *Conner* (1963), 135 Ind. App. 167, 189 N.E.2d 590.

## DECISION

Whatever the validity of such arguments they are of no effect in the case at bar, where the Uniform Arbitration Act specifically provides:

"ACT not retroactive.—This act applies only to agreements made subsequent to the effective date [August 18, 1969] of this Act."

In light of such explicit language the above principles of statutory construction cannot be used to supplement the 1968 contract between the parties.

Further, we do not consider TR. 38(E) as providing a remedy. By its plain language the Rule states simply that the Rules shall not affect agreements to arbitrate. We note that the Rules became effective after the Uniform Arbitration Act was passed. Therefore, with an Arbitration Act already in existence it would be unnecessary for the trial rules to create a remedy where one already existed. In our opinion TR. 38(E) merely acknowledges the Uniform Arbitration Act and the power or capacity of any party or parties to submit disputes to arbitration.

The fact that the contract was assigned in 1972 does not alter our conclusion. We are here concerned with the validity and enforceability of the contract as originally drafted. The assignment did not amend the obligations of the parties, or include by reference, or otherwise, any statutory enactments. Rather, the assignment clearly states that the assignee would take over subject to the terms of the original contract.

## II.

We next consider Pathman's argument that the United States Arbitration Act has pre-empted Indiana law on the subject here involved.

Pathman contends that the Federal Act was enacted pursuant to Article I, Section 8 of the Constitution, which gives Congress exclusive power to "regulate commerce with foreign nations and among the several states and with Indian tribes." Therefore, Pathman argues that it was the clear intent of Congress to create a body of substantive law relative to arbitration agreements in contracts which evidence a transaction in "commerce."

Pathman maintains that the use of numerous out-of-state subcontractors and the fact that Company is an Illinois business entity clearly demonstrate the interstate nature of the contract between the parties.

In response to Pathman's pre-emption arguments Hospital initially argues that Pathman misses the "threshold point that the federal law does not apply to this case." Hospital contends that the United States Arbitration Act does not and cannot create a capacity to arbitrate in state governmental bodies when such bodies exist only by state statutory enactment.

Hospital contends that the United States Arbitration Act provides for *federal* remedies in matters before a *federal* court. In addition, Hospital maintains that even if this case were within the federal Act it involves the same type of "paramount public interest" which has prompted some courts to refuse to apply the federal Act.[1]

In the alternative Hospital seeks to invoke that portion of Section 2 of the United States Arbitration Act which states that agreements to arbitrate are valid and irrevocable "save

---

1. See *A&E Plastik Pak Co., Inc.* v. *Monsanto Co.*, 396 F.2d 710 (9th Cir. 1968); *American Safety Equipment Corp.* v. *J. B. Maguire & Co.* 391 F.2d 821 (2d Cir. 1968); *Cobb* v. *Jerry Lewis et al.*, 488 F.2d 41 (5th Cir. 1974).

upon such grounds as exist at law or in equity for the revocation of any contract."

Hospital argues that it lacked power to enter such an arbitration agreement and that such agreements were, in 1968, contrary to express public policy in Indiana. In support of this argument Hospital cites numerous cases and statutory sections which will be considered below. Finally, Hospital contends that the issue of capacity to contract is one to be decided by reference to state law alone.[2]

## DECISION

Section 2 of the United States Arbitration Act provides that:

"A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

The United States Supreme Court has dealt most explicitly with the United States Arbitration Act in *Prima Paint Corp.* v. *Flood & Conklin Mfg. Co.* (1967), 388 U.S. 395. In that decision the Supreme Court took special note of *Robert Lawrence Co.* v. *Devonshire Fabrics, Inc.*, 271 F.2d 402 (2d Cir. 1959), cert. granted 362 U.S. 909, cert. dismissed under Rule 60, 364 U.S. 801, a case upon which Pathman places much reliance.

In *Robert Lawrence,* the Second Circuit reached the following conclusions:

". . . We think it is reasonably clear that the Congress intended by the Arbitration Act to create a new body of federal substantive law affecting the validity and interpre-

---

2. The Indiana Arbitration Act which was in existence in 1968 is not directly applicable to the case at bar inasmuch as it permitted arbitration of *existing* disputes only. See, IC 1971, 34-4-1-1 *et seq.*, Ind. Ann. Stat. § 3-201, *et seq.*

tation of arbitration agreements . . . This indicates a congressional intention to rely on the admiralty power . . . and the commerce power . . .

\* \* \*

To be sure much of the Act is purely procedural in character and is intended to be applicable only in the federal courts. But Section 2 declaring that arbitration agreements affecting commerce or maritime affairs are 'valid, irrevocable, and enforceable' goes beyond this point [i.e., mere procedure] and must mean that arbitration agreements of this character, previously held by state law to be invalid, revocable or unenforceable are now made 'valid, irrevocable, and enforceable.' This is a declaration of national law equally applicable in state or federal courts." (Citations omitted.)

In affirming the Second Circuit, the Supreme Court, in *Prima,* agreed that a claim of fraud in the making of the entire contract was a question for the arbitrators, and that "this rule—one of 'national substantive law'—governs." The Court thus followed *Robert Lawrence,* "albeit for somewhat different reasons."

We note that the precise question facing the Supreme Court in *Prima* was "whether Congress may prescribe how federal courts are to conduct themselves with respect to subject matter over which Congress plainly has power to legislate." *Prima, supra,* at p. 405.

Thus, although the *Prima* decision could be cited as direct support of the *Robert Lawrence* rationale, the majority of the opinion does, in fact, deal with conduct in the federal courts. The force of the *Prima* decision is thus somewhat weakened where, as here, we are faced with litigation brought in a state court.

However, after considering *Prima* in some detail we are of the opinion that the conclusion in *Robert Lawrence* is, in fact, supported by the decision of the Supreme Court.

At page 405 of the *Prima* decision the Supreme Court decided that Congress may prescribe rules for federal courts. Then the court stated:

". . . And it is clear beyond dispute that the federal arbitration statute is based upon and confined to the incontestable federal foundations of 'control over interstate commerce and over admiralty.' . . ." (See also, footnote 13 at page 405 of the *Prima* decision)

By this declaration the Supreme Court recognized that the United States Arbitration Act was based on exclusively federal power.

It is this power to regulate commerce which we feel mandates the conclusion that the United States Arbitration Act must prevail wherever there is an arbitration agreement in a contract evidencing a "transaction in commerce." We find support for our conclusion in the courts of various jurisdictions. *Medical Development Corp.* v. *Industrial Mode, Inc.* (10th Cir. 1973), 479 F.2d 345; *Erving* v. *Virginia Squires Basketball Club* (2d Cir. 1972), 468 F.2d 1064; *Collins Radio Co.* v. *Ex-Cell-O Corp.* (8th Cir. 1972), 467 F.2d 995; *Aberthaw Construction Co.* v. *Centre County Hospital* (M.D. Pa. 1973), 366 F.Supp. 513; *Bartell Media Corp.* v. *Fawcett Printing Corp.* (S.D. N.Y. 1972), 342 F.Supp. 196; *Pinkis* v. *Network Cinema Corp.* (1973), 9 Wash. App. 337, 512 P.2d 751.

Regardless of the widespread adoption of the *Robert Lawrence* position, Hospital urges us to follow the rationale of *Pullman, Inc.* v. *Phoenix Steel Corporation* (1973), 304 A.2d 334, in rejecting the rationale of *Robert Lawrence*.

In *Pullman* the court decided, in interpreting *Prima Paint Corp. supra,* that:

". . . the Supreme Court in *Prima Paint* held that the United States Arbitration Act established a substantive rule of federal law which relieved the federal courts of the necessity of applying State law in diversity cases under the *Erie-Guaranty Trust* doctrine. The Court did not hold, as argued by *Phoenix,* that Congress had preempted the field of contracts in interstate commerce to the extent that State courts are obliged to apply the federal law in such cases. . . ."

The *Pullman* court thus found they were not bound to apply federal law and that the law of Delaware would control.

Were we to follow *Pullman* we feel that the intended force and effect of the Federal Act would be negated. Although for many years the courts were loath to enforce any arbitration agreement, stating they ousted courts of jurisdiction, it appears that the clear intent of Congress was to make available to the business world the benefits of arbitration, and to ease congestion in the courts. *American Airlines, Inc.* v. *Louisville & Jefferson County Air Board* (6th Cir. 1959), 269 F.2d 811; *Galt* v. *Libbey-Owens Ford Glass Co.* (7th Cir. 1967), 376 F.2d 711; *Robert Lawrence Co.* v. *Devonshire Fabrics, supra; Kulukundis Shipping Co.* v. *Amtorg Trading Corp.* (2d Cir. 1942), 126 F.2d 978.

Further, by exercising its broad federal power in the area of commerce, Congress could hope to inject some uniformity into the field of interstate commerce, and into disputes which may arise in connection therewith. This consideration plays no small part in our decision, and we see no substantial question which may arise under the doctrine of *Erie Railroad Co.* v. *Tompkins* (1938), 304 U.S. 64.[3]

Indeed, if the Federal Act were applicable only to actions brought in federal courts, as Hospital maintains, the plaintiff could effectively "forum shop" to his benefit. If the state were one which had express public policy against enforcement of agreements to arbitrate, as did Indiana in 1968,[4] the suit could be shifted to federal court, assuming jurisdiction was

---

3. In *Erie* the court clearly decided there was no such thing as federal general common law and that the law to be applied in any case brought in a federal court by diversity jurisdiction was that of the state wherein the court was sitting. However, we note that there is an exception to this rule, "in matters governed by the Federal Constitution or by Acts of Congress." Clearly the Federal Arbitration Act falls within this exception.

4. There can be no dispute that the courts of this State repeatedly refused to enforce agreements to arbitrate future disputes. See, *Kistler* v. *The Indianapolis-St. Louis Railroads* (1882), 88 Ind. 460; *The Supreme Council of the Order of Chosen Friends* v. *Forsinger* (1890), 125 Ind. 52, 25 N.E. 129; *Lerma* v. *Allstate Insurance Co.*, 301 F.Supp. 361 (N.D. Ind. 1968); *Indiana Insurance Co.* v. *Noble* (1970); 148 Ind. App. 297, 265 N.E.2d 419.

satisfied, and a different result obtained. While we need not consider in detail the difference between settling a dispute in a court as opposed to arbitration, we would point out that:

". . . If the federal court allows arbitration where the state court would disallow it, the outcome of litigation might depend on the courthouse where suit is brought. For the remedy by arbitration, whatever its merits or shortcomings, substantially affects the cause of action created by the State. The nature of the tribunal where suits are tried is an important part of the parcel of rights behind a cause of action. The change from a court of law to an arbitration panel may make a radical difference in ultimate result. . . ." *Bernhardt* v. *Polygraphic Co.* (1956), 350 U.S. 198 at p. 203.

From what has been said above it is apparent that the Federal Arbitration Act will apply whether the action is brought in state or federal court. *AAACon Auto Transport, Inc.* v. *Newman* (1974), 356 N.Y.S.2d 171; *Aero-Jet General Corp.* v. *Non-Ferrous Metal Refining Ltd.* (1971), 322 N.Y.S.2d 33; *Matter of A/S Ludwig Mowinckels Rederi* (1970), 307 N.Y.S.2d 660, 255 N.E.2d 774.

In concluding this portion of our decision we take special note of the case of *American Airlines, supra.* That case involved a public body, an air board, and litigation which developed over an arbitration agreement in a contract between the board and American Airlines. We find the conclusions of that court, as they relate to the Federal Arbitration Act, particularly applicable here, and quote from that opinion to summarize our conclusions to this point and present the foundation for Hospital's further argument:

"The considerations just stated combine to impel the conclusion that, as to the question at hand, the Federal arbitration statute was intended to declare no more [and no less] than that agreements to arbitrate 'involving commerce' [9 U.S.C. §§ 1 and 2], previously held invalid or revocable or unenforceable for *policy* reasons apposite to arbitration in particular, such as ousting the courts of jurisdiction, are by virtue of the Federal arbitration statute valid and enforceable, unless by other Federal law or by State law such agreements are for *other reasons* to be held

invalid or revocable or unenforceable." (Emphasis added.)[5] 269 F. 2d at 816.

## III.

Having decided that the United States Arbitration Act must prevail wherever applicable, we must now determine whether the contract here involved is one within the scope of the Act—i.e., one evidencing a transaction in commerce.

Section 1 of the Act defines commerce as follows:

"(C)ommerce among the several states or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between any such Territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation. . . ."

In *Prima Paint, supra,* the Supreme Court, in holding that a consulting agreement was "inextricably tied to . . . interstate transfer," found persuasive the House Report on the Act[6] which states:

"[t]he control over interstate commerce . . . reaches not only the actual physical interstate shipment of goods but also contracts relating to interstate commerce."

In addition to *Prima,* numerous other courts have considered the question here presented and have generally held that the Act, in this respect, should receive a liberal construction. *Robert Lawrence, supra; Metro Industrial Painting Corp.* v. *Terminal Construction Co.* (2d Cir. 1961), 287 F.2d 382 (and note concurring opinion at p. 388); *Medical Development Corp., supra; Litton RCS Inc.* v. *Pennsylvania Turnpike Commission* (E.D.Pa. 1974), 376 F. Supp. 579; *Laupheimer* v. *McDonnell & Co., Inc.* (2d Cir. 1974), 500 F.2d 21.

Many of these cases were considered by the court in *C.P. Robinson Construction Co.* v. *National Corp. for Hous. Part.,*

---

5. We note that this conclusion is in accord with Hospital's argument that the Federal Act cannot "create" a power to arbitrate. The Act has been properly interpreted to mean that *if* there is an arbitration clause in a specific type of contract which is not avoidable by way of the usual contract defenses then such a clause is valid. The statute is not creative but preservative in nature.

6. H.R. Rep. #96, 86th Cong., 1st Sess., 1 (1924).

(M.D.N.C. 1974), 375 F. Supp. 446 and the conclusion reached, in our opinion, is in accord with the Federal Act.

> "The case law definition of transactions involving commerce to which Title 9 is applicable is broad and includes trade generally between citizens of the several states, including the purchase and sale of property of all kinds and descriptions. Evidence of purchases of large quantities of building materials and fixtures from out-of-state suppliers is an undisputed part of the record of this case. . . . Some of the labor force employed in the housing project crossed state lines in the course of their employment. In short, the Bingham Heights Limited Partnership Agreement contemplated and involved transactions in commerce as the term applies to Title 9."

In the case at bar the parties to the original contract were located in separate states and we feel it is a fair conclusion that at least some interstate activity was contemplated. Further, even though the contract was assigned to an Indiana corporation in 1972, substantial amounts of material continued to travel to Vincennes from out of the state, some of which was manufactured particularly for the Good Samaritan Hospital. In addition, there is some evidence that certain employees crossed state lines in order to work at the hospital.

While certainly the hospital itself is not involved in interstate commerce, we must focus on the plain words of the statute and inquire whether the *contract* involves a "transaction involving commerce." We feel that it does.

This conclusion comports with our belief that a main purpose for the enactment of the Arbitration Act was to offer the business world an expedient means of settling disputes, thereby saving expense and delay of litigation. We do not mean by this decision to recommend arbitration or exalt it as the answer to the woes of the business world. Certainly, there are drawbacks which make arbitration highly unfavorable in some situations for some parties. We simply hold that "commerce" as it relates to the application of the United States Arbitration Act should be construed to further the obvious purpose of the legislation and promote uniformity in its application.

## IV.

Having decided the supremacy of the Federal Arbitration Act, and that it is in fact applicable in the case at bar, it is now necessary to consider what, if any, laws or theories, aside from "policy" reasons, compel us to hold the arbitration agreement unenforceable.

Hospital earnestly maintains that the arbitration agreement is unenforceable because, as a political body, it lacked the capacity to enter such an agreement. Therefore Hospital maintains that an agreement to arbitrate was *ultra vires* the body. We would agree with Hospital's contentions that a public body is limited by the powers delegated to it by statute. Therefore, we shall examine the authority which Hospital cites in support of its contention that the statutory powers granted to it by the Legislature do not include the power to enter into a binding arbitration agreement.

Hospital places principal reliance on IC 1971, 16-12-20-9 (Burns Code Ed.) and IC 1971, 16-12.1-3-20 (Burns Code Ed.), pertinent parts of which state, respectively:

"16-12-20-9 [22-3208]. Powers and duties of board of directors. — . . . The board shall also have full power, acting in the name of the authority, as follows:

(a) To sue and be sued, plead and be impleaded: Provided, however, That any and all actions against the authority shall be brought in the circuit or superior courts of the county in which the authority is located."

"16-12.1-3-20 [22-3125]. Legal status of the board.— The board is a body corporate and politic with the style of 'The Board of Trustees of ——— Hospital,' such name to include the full name of the hospital; in that name and capacity to sue and be sued, plead and be impleaded, Provided, however, That any and all actions against the board shall be brought in the circuit or superior courts of the county in which the hospital is located; . . ."

Hospital maintains that these sections establish that "any action" must be brought in court, thereby implicitly disallowing resort to any other means of settling disputes. Hospital contends that when suit was brought in 1973 these statutes

were in effect and required Pathman to seek resolution of any disputes in a court of law. Hospital asserts that Pathman, when dealing with a governmental entity, was bound to take notice of that entity's statutory powers.

## DECISION

Initially, we note that IC 1971, 16-12.1-3-20 was not in effect when the contract was signed in 1968.[7] Insofar as Hospital maintains that Pathman was on notice as to this section when the contract was consummated, the argument must fail. However, both statutes were in full force in 1973 when this action was commenced and we, therefore, consider its effect on the present litigation.

In our opinion the above statutes do not support the Hospital's contention.

To adopt Hospital's reasoning would necessitate a strained construction of the above statutes. First, to broaden the scope of "action" to include any dispute seems unrealistic, especially in light of the consideration above that one purpose of arbitration is to *reduce* litigation. The term "action" in its usual sense, at least its usual legal sense, means a suit brought in court, a formal complaint within the jurisdiction of a court of law. We are supported in this conclusion by Ind. Rules of Procedure, Trial Rules 2 (A) and 3, which state as follows:

(Trial Rule 2)
"(A) There shall be one [1] form of action to be known as 'civil action.'

(Trial Rule 3)
"A civil *action* is commenced by filing a complaint with the *court* or such equivalent pleading or document as may be specified by statute." (Emphasis added.)

Given the above we cannot perceive how the statutes cited by Hospital sustain its conclusion that it lacked the capacity to enter into an arbitration agreement. We note in passing that were we to construe "action" to include non-legal matters,

7. This section was added by Acts 1971, P.L. 220, ch. 4, § 20, p. 863.

Hospital could force other parties to sue in a particular court while Hospital itself would face no such express restriction. Such an inequitable result ignores the basic purposes and flexibility of arbitration agreements. Finally, we note that several statutory sections which deal with the Board's or Association's power to contract for various buildings and materials do not in any way deny the power to enter arbitration agreements. See IC 1971, 16-12-20-9 (e) and (h) ; 16-12.1-3-2 ; 16-12.1-3-3 (all cites to Burns Code Ed.)

Hospital cites one other statutory section, that being 42 U.S.C.A. § 291 m:

> "Except as otherwise specifically provided, nothing in this subchapter shall be construed as conferring on any Federal officer or employee the right to exercise any supervision or control over the administration, personnel, maintenance, or operation of any facility with respect to which any funds have been or may be expended under this subchapter."

This section is cited for the dual purpose of showing that "paramount public issues" are involved, and that federal intervention into the present contract is unwarranted.

While we do not question the validity of the above federal statute it is inapposite to the matters here in dispute. The statute, which deals with federal funding of local hospitals, simply states that the extension of federal loans does not create a right of federal control over the borrowing institution. We fail to see how submitting a dispute to arbitration amounts to "supervision or control" over the Hospital. That portion of the Federal Arbitration Act with which we are most concerned, i.e., § 2, does not prescribe that federal personnel should arbitrate disputes or otherwise assume control of the hospital facility. Thus, 42 U.S.C.A. § 291 does not support the "hands off" argument or Hospital's contention that the issues are of paramount public interest.

In this same argument Hospital also relies on those cases cited in Footnote 1, *supra,* and we now consider their specific application to this argument.

We deem it unnecessary to present a lengthy discussion of these cases inasmuch as we consider them clearly distinguishable. All of the cited cases involved anti-trust violations. As stated at p. 826 of *American Safety Equipment Corp., supra:*

> "A claim under the antitrust law is not merely a private matter. The Sherman Act is designed to promote the national interest in a competitive economy; . . . Antitrust violations can affect hundreds of thousands—perhaps millions—of people and inflict staggering economic damage. . . ." 391 F.2d at 826.

While we do not assert that construction of a county hospital is a purely private matter, we do not consider the issues here involved to be of the nature which moved the above courts to refuse application of the United States Arbitration Act. The disputes between Pathman and Hospital are certainly not unique, and do not, and will not, have widespread effect throughout the nation, as does an anti-trust violation. Therefore, we hold that the construction of a county hospital, even though the public may have in some way been involved, does not involve such paramount public issues that all disputes must be resolved in a court of law.[8]

Hospital has further raised the interesting argument that a "contract void as against public policy stands on the same footing as one made in contravention of the statute." Citing and quoting *Collier Shovel & Stamping Co.* v. *City of Washington* (1905), 38 Ind. App. 370, 76 N.E. 122.

Although there may be some validity to the argument, we feel its application is limited by the facts. In *Collier,* the contract was held void because a public tax fund was being depleted in favor of one type of private business. Clearly, this is an issue of public concern. However, we decline to follow *Collier* here, inasmuch as we have determined, *supra,* that the validity of an arbitration clause does not raise issues of paramount public concern.

---

8. We note that Hospital or any body can avoid application of the Act by simply keeping an arbitration agreement out of the contract.

For the sake of clarity we now summarize our conclusions as follows:

The contract in question is one clearly evidencing transactions in commerce within the meaning of Section 2 of the United States Arbitration Act. Inasmuch as the Act is based upon the power of Congress to regulate interstate commerce and it is expressly applicable to all contracts involving commerce, we find that the provisions of the Federal Act must control in the case at bar.

The express public policy of this State, clearly evidencing a reluctance to enforce agreements to arbitrate future disputes, cannot stand in light of the Federal Act. Further, the statutory powers granted Hospital do not, expressly or impliedly, deny it the power to enter a binding arbitration agreement.

Having reached the above conclusions, the injunction preventing the enforcement of the arbitration agreement should be and hereby is dissolved and held for naught and the cause remanded for all other relief in accordance with this opinion.

Robertson, C.J. and Lybrook, J., concur.

NOTE.—Reported at 326 N.E.2d 844.