BURKE COUNTY PUBLIC SCHOOLS BOARD OF EDUCATION v. THE SHAVER PARTNERSHIP

No. 94

(Filed 8 July 1981)

1. **Arbitration and Award § 1— Federal Arbitration Act—transaction involving commerce**

    A contract need not contemplate the interstate shipment of goods in order for it to evidence "a transaction involving commerce" within the meaning of the Federal Arbitration Act; rather, a contract evidences a transaction involving commerce where performance of the contract necessarily involves, so that the parties to the agreement must have contemplated, substantial interstate activity.

2. **Arbitration and Award § 1— contract to design school buildings—Federal Arbitration Act—transaction involving commerce**

    A contract for defendant architectural firm to design two school buildings for plaintiff board of education was a "contract evidencing a transaction involving commerce" within the meaning of § 2 of the Federal Arbitration Act where the contract contemplated that architectural services would be rendered by a firm with its principal place of business in Indiana for the construction of two schools in North Carolina; the contract required the architect to consult with the owner, to prepare schematic design studies, to prepare a statement of probable construction costs and working drawings and specifications, to assist the owner in obtaining bids and awarding construction contracts, to make periodic visits to the construction site, to issue the owner's instructions to the contractor and guard against work deficiencies, and to keep accounting records; the design work for the buildings was done in Indiana; most of the field work was done by personnel working out of the Indiana office; the bookkeeping and accounting records were maintained in Kansas; plaintiff made payments to the defendant's Indiana office; defendant dealt with representatives of building material suppliers from all over the country and specified the use of materials manufactured by suppliers in several states; and the structural engineering design work was performed for defendant by a Michigan firm.

3. **Arbitration and Award § 1— Federal Arbitration Act—application by State courts**

    The courts of this State must, by virtue of the Supremacy Clause, U.S. Const. Art. VI, Clause 2, apply the Federal Arbitration Act to a contract evidencing a transaction involving commerce notwithstanding the contract contains a provision calling for application of North Carolina law.

    Justice MEYER did not participate in the consideration and decision of this case.

ON discretionary review[1] of a decision of the Court of Appeals[2] affirming Judge Griffin's order at the 18 May 1979 Session of BURKE Superior Court denying defendant's motion to stay this lawsuit and granting plaintiff's motion to stay further arbitration proceedings. This case was argued as No. 106, Fall Term 1980.

*Simpson, Aycock & Beyer, P.A., by Samuel E. Aycock, Attorneys for plaintiff appellee.*

*Moore and Van Allen, by Jeffrey J. Davis, Attorneys for defendant appellant.*

EXUM, Justice.

This appeal presents two questions. First, whether the contract between plaintiff and defendant is "a contract evidencing a transaction involving commerce" within the meaning of § 2 of the Federal Arbitration Act.[3] We conclude that it is. Second, whether the Federal Arbitration Act must be applied in state courts. We hold, for reasons given, that it must.

Defendant is a multi-state architectural firm which, in 1969, contracted with plaintiff to design two school buildings. After one of the buildings was built and occupied plaintiff discovered that the roof leaked and would require extensive repairs. Plaintiff, alleging that the leaks were caused in part by design defects, on 14 February 1979 instituted this lawsuit for $150,000 damages for breach of contract. Defendant on 2 March[4] filed a demand for arbitration of the dispute with the American Arbitration Association in accordance with Article Eleven of the contract which provides, "all claims, disputes and other matters in question arising out of . . . this Agreement or the breach thereof shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then obtaining. This agreement so to arbitrate shall be specifically enforceable under the prevailing arbitration law." On 12 April

---

1. Allowed 15 August 1980.

2. Reported at 46 N.C. App. 573, 265 S.E. 2d 481 (1980).

3. 9 U.S.C. §§ 1-14 (1976).

4. All events in the trial court occurred in 1979.

defendant moved for stay of the lawsuit pending arbitration. Plaintiff on 3 May moved for and was granted by Judge Riddle a temporary restraining order staying further arbitration proceedings. On 18 May Judge Griffin denied defendant's motion to stay the lawsuit and allowed plaintiff's motion to stay further arbitration proceedings. Judge Griffin held that plaintiff had "the right . . . to disregard the agreement to arbitrate future disputes and institute litigation" since he found the law applicable to this dispute to be former G.S. § 1-544 and cases decided thereunder.[5] He rejected defendant's contention that the dispute is subject to compulsory arbitration under § 2 of the Federal Arbitration Act which provides:

> "A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

---

5. Former G.S. § 1-544 provided:

"Agreement for arbitration.— *Two or more parties may agree in writing to submit to arbitration,* in conformity with the provisions of this article, *any controversy existing between them at the time of the agreement* to submit. Such an agreement shall be valid and enforceable, and neither party shall have the power to revoke the submission without the consent of the other party or parties to the submission save upon such grounds as exist in law or equity for the rescission or revocation of any contract." (Emphasis supplied.)

Cases interpreting this provision concluded that agreements to arbitrate future disputes could not oust the courts of their jurisdiction. *See, e. g., Skinner v. Gaither Corp.,* 234 N.C. 385, 67 S.E. 2d 267 (1951).

Agreements to arbitrate future disputes are now, by virtue of G.S. 1-567.2, effective 1 August 1973, binding and irrevocable. This provision provides in pertinent part:

"*Arbitration agreements made valid, irrevocable and enforceable; scope.* — (a) Two or more parties may agree in writing to submit to arbitration any controversy existing between them at the time of the agreement, or they may include in a written contract a provision for the settlement by arbitration of any controversy thereafter arising between them relating to such contract or the failure or refusal to perform the whole or any part thereof. Such agreement or provision shall be valid, enforceable, and irrevocable except with the consent of all the parties, without regard to the justiciable character of the controversy."

On 29 May defendant moved that the court amend its findings of fact, stay the lawsuit, and dissolve the injunction prohibiting arbitration. This motion was denied by Judge Griffin on 26 June.

The Court of Appeals affirmed. It found the dispositive issue to be "whether the contract between the parties is a transaction involving interstate commerce" within the meaning of the Federal Arbitration Act.[6] If so, it concluded, the federal act "supersedes conflicting state law, notwithstanding a choice of law provision in the contract." The Court of Appeals concluded, however, that the contract in question did not evidence a transaction involving commerce.

It reached this conclusion notwithstanding contractual provisions indicating that the parties contemplated substantial interstate activity and its recognition that the following facts set forth in the affidavit of John Shaver, a general partner of defendant, are undisputed:

"2. At the time the building which is the subject of this action was designed and built, The Shaver Partnership had offices in Salina, Kansas, Michigan City, Indiana, and Hickory, North Carolina.

3. Virtually all of the design work done for the building which is the subject of this lawsuit was done in Michigan City, Indiana.

4. Even during the construction phase, most of the field work was done by personnel working out of the Michigan City, Indiana, office.

5. Approximately 85% to 90% of all the work done by The Shaver Partnership in fulfillment of its contract with respect to the building that is the subject of this lawsuit was done in Michigan City, Indiana.

6. All of the bookkeeping and accounting records maintained by The Shaver Partnership with respect to the design and construction of the building that is the subject of this lawsuit were maintained in Salina, Kansas.

6. Commerce is defined in § 1 of the Act as "commerce among the several states . . . ."

7. Payments made by Plaintiff in this action to The Shaver Partnership for work done in the design of the building that is the subject of this lawsuit were made to The Shaver Partnership's office in Michigan City, Indiana.

8. In the course of the design of the building that is the subject of this lawsuit, personnel from The Shaver Partnership had numerous dealings with representatives of building material suppliers from all around the country concerning the specification of building materials for the construction of the buildings.

9. In fact, The Shaver Partnership did indeed specify the use of materials manufactured by suppliers in many different states, for the construction of the building that is the subject of this lawsuit.

10. In addition, in the course of performing the contract for the design of the building that is the subject of this lawsuit, The Shaver Partnership consulted with an Indiana food service consultant for the design of food service facilities for the building.

11. Also, the structural engineering design work, required for the design of the building that is the subject of this lawsuit, was performed for The Shaver Partnership by Carl Walker Associates, whose offices are in Kalamazoo, Michigan."

Relying, however, on *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967), the Court of Appeals held that in order for a contract to evidence a transaction involving commerce within the meaning of the Federal Arbitration Act it must involve or relate to the "actual physical interstate shipment of goods." It then concluded that the Act was inapplicable since "the essence of the contract was for the defendant to provide architectural services to plaintiff for the construction of two high schools. The architectural services were the very heart of the contract, that is the consummation of it. *The . . . factors* [contained in the affidavit set forth above] *incidental to the contract*, many of which might go to establish diversity of citizenship between the parties, *do not establish that the essence of the contract . . . involve commerce, e.g., the interstate shipment of goods.*" (Emphasis supplied.)

Plaintiff urges this Court to adopt the Court of Appeals' reading of *Prima Paint* and affirm. Defendant contends that the Court of Appeals "simply used the wrong test in determining whether interstate commerce was involved in this matter."

We agree with defendant. In concluding that a contract must involve or relate to the interstate shipment of goods in order for it to evidence "a transaction involving commerce" the Court of Appeals has fashioned a narrow view of the federal act's applicability which, while purportedly based on *Prima Paint*, is, instead, incongruous both with it and with numerous federal and state decisions. We must, therefore, reverse.

I

*Prima Paint* involved a "consulting agreement" which was related to a contract whereby a multistate paint business was sold and its manufacturing operation transferred from New Jersey to Maryland. The United State Supreme Court, in concluding that the consulting contract evidenced a transaction involving commerce, found that "[t]he consulting agreement was inextricably tied to this interstate transfer and to the continuing operations of an interstate manufacturing and wholesaling business. There could not be a clearer case of a contract evidencing a transaction in interstate commerce." *Id.* at 401. Mr. Justice Black, in dissent, contended that Congress intended the Federal Arbitration Act to apply only to "contracts between merchants for the interstate shipment of goods." Mr. Justice Fortas, writing for a six-member majority, responded to the dissent in footnote 7:

> "It is suggested in dissent that, despite the absence of any language in the statute so indicating, we should construe it to apply only to 'contracts between merchants for the interstate shipment of goods.' Not only have we neither the desire nor the warrant so to amend the statute, but we find persuasive and authoritative evidence of a contrary legislative intent. *See, e.g.,* the House Report on this legislation which proclaims that '[t]he *control over interstate commerce* [one of the bases for the legislation] *reaches not only the actual physical interstate shipment of goods but also contracts relating to interstate commerce.*' H. R. Rep. No. 96, 68th Cong. 1st Sess., 1 (1924). We note, too, that were the dissent's curious narrowing of the statute correct, there would have

been no necessity for Congress to have amended the statute to exclude certain kinds of employment contracts. See § 1. In any event, the anomaly urged upon us in dissent is manifested by the present case. It would be remarkable to say that a contract for the purchase of a single can of paint may evidence a transaction in interstate commerce, but that an agreement relating to the facilitation of the purchase of an entire interstate paint business and its re-establishment and operation in another State is not." *Id.* at 401-02. (Emphasis supplied.)

The Court of Appeals concluded that the statement, "control over interstate commerce . . . reaches not only the actual physical interstate shipment of goods but also contracts relating to interstate commerce," equates the term "interstate commerce" with the phrase "actual physical interstate shipment of goods." Therefore only contracts relating to the interstate shipment of goods would be covered by the federal act. This conclusion considered in light of the entire footnote and decisions rendered both before and after *Prima Paint* is without question incorrect.

Footnote 7 was in essence the rejection by a majority of the Court of the dissent's contention that only contracts between merchants for the interstate shipment of goods could evidence "a transaction involving commerce." The majority's position was that Congress intended the federal act to encompass not only contracts for the interstate shipment of goods but also contracts merely "relating to interstate commerce." Furthermore the majority did not view "relating to interstate commerce" as equivalent to "relating to the actual physical interstate shipment of goods." Instead, it viewed the phrase "relating to interstate commerce" in a broader, more encompassing sense. To state this view was, indeed, the purpose of footnote 7. Had the Court's majority, while holding that the act was not restricted to contracts *for* the interstate shipment of goods, intended to restrict the act's applicability to contracts *involving* or *relating* to the interstate shipment of goods we think it would have said so, especially since such a restriction would have conflicted both with language

from an earlier opinion, *Bernhardt v. Polygraphic Co.*, 350 U.S. 198 (1956),[7] and with earlier lower court decisions.[8]

Further, decisions rendered both in federal and state courts since *Prima Paint* establish almost beyond argument that personal service contracts whose "essence" does not involve or relate to, *i.e.*, which do not contemplate or call for, the interstate shipment of goods may nonetheless evidence a transaction involving commerce within the meaning of the Federal Arbitration Act.[9] Many of these decisions rely on *Prima Paint*. We find one, *Erving v. Virginia Squires Basketball Club*, 468 F. 2d 1064 (2d Cir. 1972), to be of particular interest.

---

7. In *Bernhardt* the Court, while holding that the contract before it did not involve commerce, suggested a liberal construction of the act's applicability: "[T]his contract [does not] evidence 'a transaction involving commerce' within the meaning of § 2 of the Act. There is no showing that petitioner while performing his duties under the employment contract was *working 'in' commerce*, was *producing goods for commerce*, or was *engaging in activity that affected commerce*. . . ." *Id.* at 200-01. (Emphasis supplied.)

8. For example, the contracts in the following cases were found to involve commerce within the meaning of § 2 even though they called for construction work to be performed entirely within one state, *i.e.*, their "essence" was not the interstate shipment of goods but was instead the construction or installation of some facility: *Galt v. Libbey-Owens-Ford Glass Co.*, 376 F. 2d 711 (7th Cir. 1967) (contract pursuant to which New York contractor came to Illinois to install glass supplied by Ohio manufacturer); *Monte v. Southern Delaware County Authority*, 321 F. 2d 870 (3d Cir. 1963) (contract to build sewer system in Pennsylvania); *Electronic & Missile Facilities, Inc. v. United States*, 306 F. 2d 554 (5th Cir. 1962), *rev'd on other grounds*, 374 U.S. 167 (1963) (contract to construct missile facilities in Georgia); *Metro Industrial Painting Corp. v. Terminal Construction Co.*, 287 F. 2d 382 (2d Cir. 1961), *cert. denied*, 368 U.S. 817 (1961) (contract to paint housing project in Florida).

9. *See e.g.*, *Varley v. Tarrytown Assoc., Inc.*, 477 F. 2d 208 (2d Cir. 1973) (textile consulting agreement whereby plaintiff would evaluate plants and fabrics manufactured throughout the country for defendant who would invest funds according to plaintiffs' recommendations); *Erving v. Virginia Squires Basketball Club*, 468 F. 2d 1064 (2d Cir. 1972) (athlete's contract to play for a professional basketball club; discussed *infra* in text); *Dickstein v. duPont*, 443 F. 2d 783 (1st Cir. 1971) (contract whereby plaintiff became defendant's "registered representative" to the New York Stock Exchange pursuant to which he would seek prospective customers nationwide); *Shearson Hayden Stone, Inc. v. Liang*, 493 F. Supp. 104 (N.D. Ill. 1980) (contract between New York Stock Exchange brokerage firm and employee); *Fox v. Merrill Lynch & Co., Inc.*, 453 F. Supp. 561 (S.D. N.Y. 1978) (pension contract between New York Stock Exchange brokerage firm and employee); *Romnes v. Bache & Co., Inc.*, 439 F. Supp. 833 (W.D. Wis. 1977) (partnership contract to trade commodities futures contracts); *Weight Watchers of Quebec Ltd. v. Weight Watchers*

*Erving* involved a contract dispute between an athlete and a professional basketball club. Plaintiff Erving sought to avoid an arbitration clause in the contract by contending that the contract did not evidence a transaction involving commerce. He relied, as does both plaintiff and the Court of Appeals in the present case, on *Conley v. San Carlo Opera Co.*, 163 F. 2d 310 (2d Cir. 1947). In *San Carlo Opera Co.*, defendant contracted for plaintiff's services as an opera singer. A dispute arose and defendant, citing the arbitration clause in the contract, demanded arbitration under the federal act. The Second Circuit concluded that even though the contract required plaintff to give operatic performances throughout the country it did not evidence a transaction involving commerce under the act. Thus *San Carlo Opera Co.* could be read to support the proposition that personal service contracts which do not involve or relate to the interstate shipment of goods do not involve interstate commerce.

In *Erving*, however, the Second Circuit repudiated this broad reading of its decision in *San Carlo Opera Co.* After noting that the foundations on which the decision rested had eroded,[10] the

---

Int'l, Inc., 398 F. Supp. 1057 (E.D.N.Y. 1975) (contract granting franchises by New York corporation to foreign corporations); *Warren Bros. Co. v. Community Bldg. Corp. of Atlanta, Inc.*, 386 F. Supp. 656 (M.D. N.C. 1974) (contract to construct apartments in North Carolina); *C. P. Robinson Const. Co. v. Nat'l Corp. for Housing Partnerships*, 375 F. Supp. 446 (M.D.N.C. 1974) (contract to construct housing project in North Carolina); *Litton RCS, Inc. v. Pennsylvania Turnpike Commission*, 376 F. Supp. 579 (E.D. Pa. 1974), *aff'd mem.*, 511 F. 2d 1394 (3d Cir. 1975) (research and development contract in which contractor agreed to use best efforts to develop toll collection equipment for State Turnpike Commission); *Keating v. Superior Court, Alameda County*, 109 Cal. App. 3d 784, 167 Cal. Rptr. 481 (1980) (franchise agreements entailing the right to use federally registered trademarks); *University Casework Systems, Inc. v. Bahre*, 362 N.E. 2d 155 (Ind. App. 1977) (contract to construct university facility in Indiana); *Pathman Construction Co. v. Knox County Hospital Ass'n*, 326 N.E. 2d 844 (Ind. App. 1975) (contract for building and remodeling of hospital); *Dean Witter Reynolds Inc. v. Roven*, 94 N.M. 273, 609 P. 2d 720 (1980) (contract for commodity trading in gold futures); *Episcopal Housing Corp. v. Federal Ins. Co.*, 269 S.C. 631, 239 S.E. 2d 647 (1977) (contract to construct housing project in South Carolina). *But see Bryant-Durham Electric Co. v. Durham County General Hospital Corp.*, 42 N.C. App. 351, 256 S.E. 2d 529 (1979) (contract to perform electrical work on hospital facility in North Carolina).

10. The Second Circuit noted at 468 F. 2d 1069:

"The District Court . . . [in deciding *San Carlo Opera Co.*] relied heavily on the Supreme Court's decision in *Federal Base Ball Club v. National League*, 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898 (1922), in holding that contracts for the

Second Circuit concluded that its "holding [in *San Carlo Opera Co.*] that a contract of personal service with a business engaged in interstate commerce is not within the Arbitration Act appears to be inconsistent with *Prima Paint . . . .*" *Erving v. Virginia Squires Basketball Club, supra,* 468 F. 2d at 1069. It then held that plaintiff Erving's contract did evidence a transaction involving commerce and that arbitration was required.

It is evident then that the Second Circuit in *Erving* read *Prima Paint* to support *Erving's* holding that a personal service contract to be performed across state lines but which does not contemplate the interstate shipment of goods may evidence a transaction involving commerce. Thus reliance by plaintiff and our Court of Appeals on *San Carlo Opera Co.* is misplaced as the Second Circuit would in fact reject, as we do, the narrow view of the federal act's applicability fashioned by our Court of Appeals.

[1] It is clear, then, that a contract need not contemplate the interstate shipment of goods in order to evidence a transaction involving commerce. As *Erving* and the decisions set forth in notes 8 and 9, *supra,* make clear, a personal service contract which contemplates substantial interstate activity is a contract evidencing a transaction involving commerce within the meaning of the act. We agree with the approach suggested by Judge Lumbard, concurring in *Metro Industrial Painting Corp. v. Terminal Construction Co.,* 287 F. 2d 382 (2d Cir. 1961), *cert. denied,* 368 U.S. 817 (1961):

> "The significant question, therefore [in determining whether a contract evidences a transaction involving com-

---

personal services of entertainers were matters of state law not the subject of interstate commerce. The Supreme Court made clear as long ago as *United States v. Shubert,* 348 U.S. 222, 75 S.Ct. 277, 99 L.Ed. 279 (1955), and *United States v. International Boxing Club,* 348 U.S. 236, 75 S.Ct. 259, 99 L.Ed. 290 (1955), that *Federal Base Ball* did not apply to any form of interstate exhibition other than baseball. Two years later, *Radovich v. National Football League,* 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed. 2d 456 (1957), held that a contract between a professional football player and his club was a subject of interstate commerce within the antitrust laws. At the last term the Court observed that *Federal Base Ball* and its successor, *Toolson v. New York Yankees, Inc.,* 346 U.S. 356, 74 S.Ct. 78, 98 L.Ed. 64 (1953), "have become an aberration confined to baseball," *Flood v. Kuhn,* 407 U.S. 258, 282, 92 S.Ct. 2099, 2112, 32 L.Ed. 2d 728 (1972). *San Carlo Opera Co.* cannot properly be given a wider application than the underpinning on which it rested."

merce], *is not whether, in carrying out the terms of the con-
tract, the parties did cross state lines, but whether, at the
time they entered into it and accepted the arbitration clause,
they contemplated substantial interstate activity. Cogent
evidence regarding their state of mind at the time would be
the terms of the contract, and if it, on its face, evidences in-
terstate traffic . . . the contract should come within § 2. In
addition, evidence as to how the parties expected the con-
tract to be performed and how it was performed is relevant
to whether substantial interstate activity was contemplated."*
287 F. 2d at 387. (Emphasis original.)

We do not mean to suggest that where the contracting parties
are merely located in different states or where other facts tend-
ing only to show diversity of citizenship are present, the contract
must necessarily be found to contemplate substantial interstate
activity so as to trigger the act's applicability. Where, however,
performance of the contract itself necessarily involves, so that the
parties to the agreement must have contemplated, substantial in-
terstate activity the contract evidences a transaction involving
commerce within the meaning of the Federal Arbitration Act.[11]

[2]  Turning to the present case, there can be no doubt that the
contract in question contemplated substantial interstate activity.
The contract, a standard form agreement between owner and ar-
chitect, states that it is between "Burke County (North Carolina)
Public Schools Board of Education" and "Shaver & Company, a
Partnership." Further, it specifically lists Lee J. Brockway as one

---

11. We note further that the Federal Arbitration Act, unlike other statutes in-
volving the commerce power, does not attempt to regulate activity affecting in-
terstate commerce. Instead, it provides for those who so desire an expeditious
quasi-judicial process for settling disputes. Parties seeking to avoid the act need
only not place an arbitration provision in their contracts. If, however, the parties do
contract for arbitration of their disputes and if their contract evidences a transac-
tion involving substantial interstate activity, then their expectations should not be
undermined by the courts. *See Metro Industrial Painting Corp. v. Terminal Const.
Co., supra,* (Lumbard concurring). Indeed, both federal and state courts favor ar-
bitration as an economical form of dispute resolution which helps relieve over-
burdened court dockets. *See, e.g., Galt v. Libby-Owens-Ford Glass Co., supra,* 376
F. 2d 711; *Robert Lawrence Co. v. Devonshire Fabrics, Inc.,* 271 F. 2d 402 (2d Cir.
1959), *cert. granted,* 362 U.S. 909 (1960), *cert. dismissed,* 364 U.S. 801 (1960);
*American Airlines, Inc. v. Louisville & Jefferson County Air Board,* 269 F. 2d 811
(6th Cir. 1959); *Singer Co. v. Tappan Co.,* 403 F. Supp. 322 (D.C. N.J. 1975), *aff'd
mem.,* 544 F. 2d 513 (3d Cir. 1976). *See also* G.S. 1-567.1 *et seq.*

of the principal architects and describes the project as being the construction of two high schools and other education facilities. Although the address of Shaver & Company is not given in the agreement between owner and architect, it is listed as follows on the standard form agreement between owner and contractor: "The Architect for this project is Shaver and Company, Lee J. Brockway, Architect, 105 Washington Street, Michigan City, Indiana." Further, the agreement between owner and contractor makes clear that the construction site of the high schools is Burke County.

It is clear then that the contract between owner and architect contemplates that on behalf of Burke County Public Schools Board of Education and in order to facilitate construction of high schools in Burke County architectural services would be rendered by a firm with its principal place of business in Indiana. Further, the contract between owner and architect calls for the architect, among other things, to consult with the owner, to prepare "Schematic Design Studies," to prepare a statement of probable construction costs and working drawings and specifications, to assist the owner in obtaining bids and awarding construction contracts, to make periodic visits to the construction site, to issue the owner's instructions to the contractor and guard the owner against work deficiencies, and to keep accounting records. In addition, undisputed statements in the affidavit submitted by John Shaver, a general partner of defendant, indicate that the design work for the buildings was done in Indiana; most of the field work was done by personnel working out of the Indiana office; the bookkeeping and accounting records were maintained in Kansas; plaintiff made payments to the defendant's Indiana office; defendant dealt with representatives of building material suppliers from all over the country and specified the use of materials manufactured by suppliers in several states; and the structural engineering design work was performed for defendant by Carl Walker Associates, a Kalamazoo, Michigan, firm. Thus the contractual provisions, the parties' circumstances at the time of the agreements, and the actual manner of performance, con-

sidered together, make clear that the parties in making the contract contemplated substantial interstate activity.[12]

We conclude, therefore, that the contract in question evidences a transaction involving commerce within the meaning of the Federal Arbitration Act.

## II

[3]   Plaintiff next contends that state courts need not apply the Federal Arbitration Act since it provides only for a federal remedy to be applied in federal courts. Thus, plaintiff argues, this Court is free to apply North Carolina law which the parties agreed would govern the contract[13] and which, at the time of contracting in 1969, made agreements to arbitrate future disputes unenforceable.[14] Defendant contends that the Federal Arbitration Act is the law in North Carolina insofar as it applies to any North Carolina contract. The Court of Appeals agreed with defendant on this point, and so do we.

The federal act applies expressly to petitions filed in "any United States district court . . . ." 9 U.S.C. § 4 (1976). However, in *Robert Lawrence Co. v. Devonshire Fabrics, Inc.*, 271 F. 2d 402 (2d Cir. 1959), *cert. granted*, 362 U.S. 909 (1960), *cert. dismissed*, 364 U.S. 801 (1960), the Second Circuit, in determining whether the validity and interpretation of an arbitration clause in a con-

---

12. We note, further, an observation made in *C. P. Robinson Const. Co. v. Nat'l Corp. for Housing Partnerships, supra*, 375 F. Supp. 446, 450, a case involving a contract to construct a housing project in North Carolina:

"Initially it is useful to examine the parties' intent in entering into an agreement with an arbitration clause. Such subjective intent of the parties is not controlling in determining if the agreement objectively evidences a transaction involving commerce, but it is illuminating as to how the parties interpreted their own contract. In this case, the plaintiffs and defendant voluntarily entered into a broad agreement to arbitrate future disputes. North Carolina statutory law, at the time the agreement was made, would not enforce future arbitration agreements. Therefore, the parties must have viewed the contract's arbitration clause as being validated by federal law, unless they sought to incorporate a useless provision into the partnership agreement."

13. The contract provides in Article 13: "APPLICABLE LAW—Unless otherwise specified, this agreement shall be governed by the law of the state of North Carolina."

14. *See supra*, n. 5.

tract evidencing a transaction involving commerce should be governed by the federal act or by state law, concluded:

> "[W]e think the text of the Act and the legislative history demonstrate that the *Congress based the Arbitration Act in part on its undisputed substantive powers over commerce and maritime matters.* To be sure much of the Act is purely procedural in character and is intended to be applicable only in the federal courts. But Section 2 declaring that arbitration agreements affecting commerce or maritime affairs are 'valid, irrevocable, and enforceable' goes beyond this point and must mean that arbitration agreements of this character, previously held by state law to be invalid, revocable or unenforceable are now made valid, irrevocable, and enforceable.' *This is a declaration of national law equally applicable in state or federal courts."* *Id.* at 407. (Emphasis supplied.)

Accordingly, the Second Circuit held that a claim of fraud in the inducement of the contract—as opposed to a claim of fraud in the inducement of the arbitration clause itself—is, as a matter of federal law, to be resolved by arbitration and not, as state law would have required in *Robert Lawrence*, by the courts.

In *Prima Paint Corp. v. Flood & Conklin Mfg. Co., supra,* the Supreme Court was faced with the same issue, *i.e.,* whether a claim of fraud in the inducement of the contract is, as a matter of federal law, to be resolved by arbitration or whether, where state law requires, it is to be resolved by the courts. The Court agreed, "albeit for somewhat different reasons," with the Second Circuit's conclusion in *Robert Lawrence* that as a matter of "national substantive law" a claim of fraud in the inducement of the entire contract is for the arbitrator to decide "even in the face of a contrary state rule." 388 U.S. at 400. While the Court did not address specifically whether this "national substantive law" must be applied in state courts, it did note that "it is clear beyond dispute that the federal arbitration statute is based upon and confined to the incontestable federal foundations of 'control over interstate commerce and over admiralty.'" *Id.* at 405.

State courts, relying on *Prima Paint* and *Robert Lawrence* for the proposition that the Federal Arbitration Act is based on Congress' power to control commerce and admiralty, have with great uniformity concluded that they must, pursuant to the

Supremacy Clause, U.S. Const. Article VI, Clause 2, apply the act to maritime transactions or contracts evidencing a transaction involving commerce notwithstanding conflicting state law.[15] We agree with this conclusion. It furthers the Congressional intent of making available to the business community the benefits of arbitration while simultaneously relieving crowded court dockets. Further, it promotes uniformity where the parties have agreed to arbitrate and discourages "forum shopping."[16]

Our conclusion that we must apply the federal act is not altered by the contractual provision calling for application of North Carolina law. The Federal Arbitration Act, by virtue of the Supremacy Clause, is, as discussed, part of North Carolina law. In

15. *See, e.g., Main v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 67 Cal. App. 3d 19, 136 Cal. Rptr. 378 (1977); *West Point-Pepperell, Inc. v. Multi-Line Indus., Inc.,* 231 Ga. 329, 201 S.E. 2d 452 (1973); *Matter of A/S Ludwig Mowinckels Rederi (Dow Chem. Co.),* 25 N.Y. 2d 576, 307 N.Y.S. 2d 660, 255 N.E. 2d 744, *cert. denied,* 398 U.S. 939 (1970); *Cooper v. Computer Credit Systems, Inc.,* 40 A.D. 2d 692, 336 N.Y.S. 2d 380 (1972); *Aerojet-General Corp. v. Non-Ferrous Metal Refining, Ltd.,* 37 A.D. 2d 531, 322 N.Y.S. 2d 33 (1971); *Pathman Construction Co. v. Knox County Hospital Ass'n, supra,* 326 N.E. 2d 844; *Episcopal Housing Corp. v. Federal Ins. Co., supra,* 269 S.C. 631, 239 S.E. 2d 647; *Miller v. Puritan Fashions Corp.,* 516 S.W. 2d 234 (Tex. Civ. App. 1974); *Mamlin v. Susan Thomas, Inc.,* 490 S.W. 2d 634 (Tex. Civ. App. 1973); *Pinkis v. Network Cinema Corp.,* 9 Wash. App. 337, 512 P. 2d 751 (1973). *But see Pullman, Inc. v. Phoenix Steel Corp.,* 304 A. 2d 334 (Del. Super. 1973).

16. As noted in *Bernhardt v. Polygraphic Co., supra,* 350 U.S. 198, which held that in a federal diversity action state, not federal, law must be applied where the transaction is wholly intrastate:

"If the federal court allows arbitration where the state court would disallow it, the outcome of litigation might depend on the courthouse where suit is brought. For the remedy by arbitration, whatever its merits or shortcomings, substantially affects the cause of action created by the State. The nature of the tribunal where suits are tried is an important part of the parcel of rights behind a cause of action. The change from a court of law to an arbitration panel may make a radical difference in ultimate result. . . . There would in our judgment be a resultant discrimination if the parties suing on a Vermont cause of action in the federal court were remitted to arbitration, while those suing in the Vermont court could not be." *Id.* at 203-04.

The converse is, of course, equally true: Parties in a state court to a contract evidencing an interstate transaction should not be permitted to avoid arbitration when, had the action been brought in federal court, they would have been compelled to arbitrate. This much flows from the denomination of compulsory arbitration as a matter of substantive, rather than procedural, law. It was so denominated in both *Bernhardt* and *Prima Paint.*

*Mamlin v. Susan Thomas, Inc.,* 490 S.W. 2d 634 (Tex. Civ. App. 1973), the Texas Court of Civil Appeals, in finding the federal act to be applicable despite the parties' selection of New York law, stated:

> "The Federal Arbitration Act is the law of New York and also the law of Texas with respect to any 'contract evidencing a transaction involving commerce,' as defined in that act. The federal act has been held to be substantive rather than procedural, and equally applicable in state and federal courts, even though the contract provides that any dispute should be settled by arbitration under the laws of a particular state." *Id.* at 637.

Similarly, in *Pinkis v. Network Cinema Corp.,* 9 Wash. App. 337, 512 P. 2d 751 (1973), the Washington Court of Appeals, in considering a contract which provided that it would be governed by New York law, stated:

> "In any event, we need not decide whether New York law would require arbitration or permit court proceedings to decide the issues raised in view of our decision that the federal act controls.
>
> "Further, our discussion has set forth the primacy of the federal arbitration act, substantively and procedurally, over state law when interstate commerce is the subject matter of the contract in dispute." 9 Wash. App. at 344-45, 512 P. 2d at 756-57.

In *Commonwealth Edison Co. v. Gulf Oil Corp.,* 541 F. 2d 1263, 1269 (7th Cir. 1976), the Seventh Circuit stated:

> "Parties are not free to burden the arbitration process under the Federal Act by adopting state law which shifts the determination of disputes from arbitrators to courts. To allow parties to so contract would undermine the provisions of the Federal Act. Congress, in enacting the Federal Arbitration Act, exercised its power over admiralty and interstate commerce. Any arbitration contract involving one of those areas is governed by the Federal Act. To permit the parties to contract away the application of the Act by adopting state law to govern their agreement would be inconsistent with the Act itself and with the holding in *Prima Paint.*"

*See also Collins Radio Co. v. Ex-Cell-O Corp.,* 467 F. 2d 995 (8th Cir. 1972); *American Airlines, Inc. v. Louisville & Jefferson Coun-*

*ty Air Board,* 269 F. 2d 811 (6th Cir. 1959); *Episcopal Housing Corp. v. Federal Ins. Co.,* 269 S.C. 631, 239 S.E. 2d 647 (1977). *But see Standard Co. v. Elliott Const. Co., Inc.,* 363 So. 2d 671 (La. 1978). We conclude therefore that the choice of law provision in the contract does not preclude application of the Federal Arbitration Act.

We hold, then, that the contract in question must be submitted to arbitration pursuant to the federal act.

The decision of the Court of Appeals is reversed and the case remanded to that court for further remand to Burke Superior Court for proceedings not inconsistent with this opinion.

Reversed.

Justice MEYER did not participate in the consideration and decision of this case.