Rickenbaugh v. Power Home Solar, LLC, 2019 NCBC 79.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 244

JAMES RICKENBAUGH; and
MARY RICKENBAUGH,
Individually and on Behalf of all
Others Similarly Situated,

Plaintiffs,

v.

POWER HOME SOLAR, LLC,

Defendant.

**ORDER AND OPINION ON
DEFENDANT'S MOTION TO DISMISS
OR, IN THE ALTERNATIVE, TO
COMPEL BILATERAL ARBITRATION
AND STAY PROCEEDINGS**

1.     **THIS MATTER** is before the Court upon Defendant Power Home Solar, LLC's ("Power Home") Motion to Dismiss or, in the Alternative, to Compel Bilateral Arbitration and Stay Proceedings (the "Motion").  (ECF No. 15.)

2.     After considering the Motion, the related briefs, and the arguments of counsel, the Court hereby **DENIES** the Motion, **DEFERS** to an arbitrator to be selected by the parties the determination of the availability of class arbitration for the claims Plaintiffs James ("James") and Mary ("Mary") Rickenbaugh (together, the "Rickenbaughs") have asserted in this action, **ORDERS** all claims asserted by Plaintiffs to arbitration, and **STAYS** litigation of Plaintiffs' claims in this civil action pending the outcome of arbitration proceedings between the parties.

*Weaver, Bennett & Bland, P.A., by Matthew M. Villmer and Bo Caudill, for Plaintiffs James and Mary Rickenbaugh.*

*The Law Office of B. Elizabeth Todd, PLLC, by Elizabeth Todd; Womble Bond Dickinson (US) LLP, by James P. Cooney; DarrowEverett LLP, by David A. Sullivan, for Defendant Power Home Solar LLC.*

Bledsoe, Chief Judge.

# I.

## FINDINGS OF FACT

3. Power Home is a Delaware limited liability company with its principal place of business in Mooresville, North Carolina. The company is one of the largest solar installation companies in the United States and operates in North Carolina, South Carolina, Virginia, Ohio, and Michigan. (Class Action Compl. ¶¶ 1, 3, 14–15, ECF No. 3.)

4. The Rickenbaughs are residents of Mecklenburg County. In 2017, they agreed to have Power Home install its standard energy savings package, including a NEST thermostat, ten LED lightbulbs, blown attic insulation, a hot water heater "blanket," and twelve solar panels at their residence and at a detached building that served as a home office in Charlotte, North Carolina. (Class Action Compl. ¶¶ 16, 25, 30, 32.)

5. According to the Rickenbaughs, Power Home's sales process was designed to make customers believe they would experience a "guaranteed drop in their energy bills" of between 80% and 99% over the 25-year lifespan of the Power Home solar energy system. (Class Action Compl. ¶ 21.) They allege that the Power Home representative they spoke with advised that the standard energy savings package they eventually purchased "was guaranteed to save [them] at least 97% on their energy bills, and any bill from Duke Energy would be a nominal amount." (Class Action Compl. ¶ 30.) Based on these representations, on February 21, 2017, James, with Mary's consent, agreed to pay $15,708 for Power Home's energy savings

package.  (Class Action Compl. ¶ 32, Ex. A.)  James and Power Home's representative electronically signed Power Home's standard purchase contract (the "Agreement") to effect the transaction.  (Class Action Compl. ¶ 32, Ex. A.)

6.    Of significance here, the Agreement contained the following provision titled "Arbitration of Disputes":

> In the event of any dispute the parties will work together in good faith to resolve any issues.  If such issues cannot be resolved, the parties agree that any dispute arising out of or relating to the negotiation, award, construction, performance or non-performance, of any aspect of this agreement, shall be settled by binding arbitration in accordance with the Construction Industry Rules of the American Arbitration Association and judgment upon the award rendered by any such arbitrator may be entered in any court having jurisdiction thereof.
>
> NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY NORTH CAROLINA & SOUTH CAROLINA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OF JURY TRIAL.  BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION.  IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPLELLED [sic] TO ARBITRATE UNDER THE AUTHORITY OF THE BUSINESS AND PROFESSIONS CODE OR OTHER APPLICABLE LAWS, YOUR AGREEMENT TO THE ARBITRATION PROVISION IS VOLUNTARY. WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTER INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION OF NEUTRAL ARBITRATION.

(Class Action Compl. Ex. A. ¶ 13.)

7.    Between February and April 2017, Power Home installed its energy efficiency products at the Rickenbaughs' residence and home office, and on April 11,

2017, the newly installed solar panels were activated.  (Class Action Compl. ¶¶ 33–34.)  The Rickenbaughs allege that the actual energy savings reflected in their power bills for May and June 2017 were only "a fraction" of the 97% energy savings promised by Power Home.  (Class Action Compl. ¶¶ 30, 35–36.)  The Rickenbaughs complained to a Power Home representative, and they allege in this lawsuit that Power Home refused to provide the promised energy savings or otherwise afford them a remedy.  (Class Action Compl. ¶¶ 37–40.)

8.     The Rickenbaughs commenced this action on January 7, 2019 "as representatives of all others similarly situated under the provisions of Rule 23(a) of the North Carolina Rules of Civil Procedure[.]" (Class Action Compl. ¶¶ 41–43.) They assert claims against Power Home for common law fraud and fraud in the inducement, unfair and deceptive trade practices under N.C.G.S. § 75-1.1, breach of contract, punitive damages, and unjust enrichment.  (*See* Class Action Compl.)  The Rickenbaughs allege that other members of the purported class include homeowners in the states in which Power Home does business and "in other places throughout the United States[,]" thus creating a class that could be made up of more than 10,000 people.  (Class Action Compl. ¶¶ 59–60.)

9.     On March 26, 2019, Power Home filed the Motion with supporting brief, contending that the Agreement requires that the Rickenbaughs' claims be adjudicated through bilateral arbitration.  (ECF Nos. 15–17.)  The Motion was fully briefed and came on for hearing before the Court on May 10, 2019.  The Court thereafter entered a stay of these proceedings under N.C.G.S. § 1-569.7(f) pending

the Court's determination of the Motion and requested supplemental briefing. (ECF No. 31.) Supplemental briefing was completed on June 10, 2019. (ECF Nos. 32–35.)

10. The Motion has been fully briefed and is now ripe for resolution.

## II.

## CONCLUSIONS OF LAW

A. Applicable Law

11. "[I]t is incumbent upon a trial court when considering a motion to compel arbitration to 'address whether the Federal Arbitration Act ("FAA") or the North Carolina Revised Uniform Arbitration Act [("NCRUAA")] applies' to any agreement to arbitrate." *King v. Bryant*, 225 N.C. App. 340, 344, 737 S.E.2d 802, 806 (2013) (quoting *Cornelius v. Lipscomb*, 224 N.C. App. 14, 18, 734 S.E.2d 870, 872 (2012)). "Determining whether the FAA applies 'is critical because the FAA preempts conflicting state law[.]'" *Epic Games, Inc. v. Murphy-Johnson*, 247 N.C. App. 54, 60, 785 S.E.2d 137, 142 (2016) (quoting *Sillins v. Ness*, 164 N.C. App. 755, 757–58, 596 S.E.2d 874, 876 (2004)). A "trial court should . . . address[ ] the issue of choice of law before addressing any other legal issue." *Bailey v. Ford Motor Co.*, 244 N.C. App. 346, 350, 780 S.E.2d 920, 924 (2015).

12. The Agreement here provides that covered disputes will be resolved by arbitration "AS PROVIDED BY NORTH CAROLINA & SOUTH CAROLINA LAW[,]" (Class Action Compl. Ex. A ¶ 13), suggesting that the parties agreed that either the NCRUAA or the South Carolina Arbitration Act, as appropriate, should apply to the application and interpretation of the arbitration provision in the Agreement.

Defendant argues, however, that the FAA should govern the arbitration provision despite the parties' choice of law. (Def.'s Brief Supp. Mot. Dismiss or, Alternative, Compel Bilateral Arbitration & Stay Proceedings [hereinafter "Def.'s Brief ISO"] 6–7, ECF No. 16.) The Court agrees.

13. The FAA applies to any "contract evidencing a transaction involving commerce[.]" 9 U.S.C. § 2 (2012). As used here, "the word 'involving' is broad and is indeed the functional equivalent of 'affecting[,]' " which "signals an intent to exercise Congress' commerce power to the full." *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 273–74, 277 (1995). The phrase "a contract evidencing a transaction involving commerce" requires only that the transaction involve interstate commerce; the parties to the transaction need not "contemplate" an interstate commerce connection. *Id.* at 278–81. Here, Plaintiffs are residents of North Carolina, and Power Home is a limited liability company organized in Delaware that operates from its North Carolina principal place of business. (Def.'s Brief ISO 7; Class Action Compl. ¶ 14–16.) According to Plaintiffs, Power Home "operates a sophisticated and fraudulent scheme throughout the states of North Carolina, South Carolina, Virginia, Ohio, and Michigan." (Def.'s Brief ISO 7; Class Action Compl. ¶ 1.) Plaintiffs' proposed class consists of Power Home customers who reside in those states and "in other places throughout the United States and its territories" who purchased Power Home's energy efficiency equipment in reliance on Power Home's guarantee of substantial energy savings. (Def.'s Brief ISO 7; Class Action Compl. ¶¶ 59–60.)

14.     Although "the mere circumstance of diversity of citizenship between [the parties] is not sufficient to command the application of the [FAA]," *Maxum Founds., Inc. v. Salus Corp.*, 779 F.2d 974, 978 n.4 (4th Cir. 1985), Plaintiffs' claims are based on more, including Power Home's sale and installation of its energy efficiency system to customers inside and outside North Carolina and its allegedly fraudulent scheme to deceive customers in at least five states.  Although denying Plaintiffs' claims, Power Home does not deny that its conduct at issue occurred both inside and outside North Carolina.  As such, the Court concludes that the arbitration provision here is "[a] written provision in . . . a contract evidencing a transaction involving [interstate] commerce" under 9 U.S.C. § 2 and thus that the FAA applies.  *See, e.g., Martin & Jones, PLLC v. Olson*, 2017 NCBC LEXIS 87, at *5 (N.C. Super. Ct. Sept. 25, 2017) ("The FAA applies to 'a written provision in . . . a contract evidencing a transaction involving [interstate] commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction.' " (quoting 9 U.S.C. § 2)); *see also Benezra v. Zacks Inv. Research, Inc.*, No. 1:11-CV-596, 2012 U.S. Dist. LEXIS 47769, at *7 n.1 (M.D.N.C. Mar. 30, 2012) ("The parties reside in different states, and the transactions . . . were conducted across state lines through interstate commerce.").

15.     The parties' choice of law provision in the Agreement does not change this result.  The Supreme Court of North Carolina has held that "where the FAA applies to a particular contract, the FAA supersedes conflicting state law even if the contract has a choice of law provision." *AP Atl., Inc. v. Crescent Univ. City Venture, LLC*, 2016 NCBC LEXIS 60, at *11 (N.C. Super. Ct. July 28, 2016); *see also, e.g., Burke Co. Pub.*

*Sch. Bd. of Educ. v. Shaver P'ship*, 303 N.C. 408, 424, 279 S.E.2d 816, 825 (1981) (holding "the choice of law provision in the contract does not preclude application of the [FAA]"). Even so, "when [as here] the FAA governs a dispute, state law fills procedural gaps in the FAA as it is applied in state courts." *Worldwide Ins. Network v. Messer Fin. Grp.*, 2018 NCBC LEXIS 103, at *6 (N.C. Super. Ct. Oct. 2, 2018) (quoting *Gaylor, Inc. v. Vizor, LLC*, 2015 NCBC LEXIS 102, at *12 (N.C. Super. Ct. Oct. 30, 2015)).

B. Arbitrability

16. "Arbitration, in various aspects, is governed by both state and federal law." *Forshaw Indus. v. Insurco, Ltd.*, 2 F. Supp. 3d 772, 786 (W.D.N.C. 2014). "[S]tate law govern[s] the formation of contracts [while] giving due regard to the federal policy favoring arbitration." *Local Soc., Inc. v. Stallings*, 2017 NCBC LEXIS 94, at *13 (N.C. Super. Ct. Oct. 9, 2017). Disputes over arbitrability require a two-step inquiry: "First, [courts] determine who decides whether a particular dispute is arbitrable: the arbitrator or the court. Second, if [the court] concludes that the court is the proper forum in which to adjudicate arbitrability, [the court] then decides whether the dispute is, in fact, arbitrable." *Gaylor*, 2015 NCBC LEXIS 102, at *14 (emphasis omitted) (quoting *Peabody Holding Co., LLC v. UMW*, 665 F.3d 96, 101 (4th Cir. 2012)). "To determine if a particular dispute is subject to arbitration, [a trial court] must examine the language of the agreement, including the arbitration clause in particular, and determine if the dispute falls within its scope." *Fontana v. S.E. Anesthesiology*, 221 N.C. App. 582, 589, 729 S.E.2d 80, 86 (2012) (citation omitted).

"[C]ourts must enforce arbitration contracts according to their terms." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019).

17. In determining whether a court or an arbitrator decides arbitrability, "[c]ourts distinguish between issues of procedural arbitrability, on the one hand, and issues of substantive arbitrability, on the other hand." *Stallings*, 2017 NCBC LEXIS 94, at \*14. "[Q]uestions such as 'whether the parties are bound by a given arbitration clause,' or 'whether an arbitration clause in a concededly binding contract applies to a particular type of controversy' " are those of "substantive arbitrability." *Bailey*, 244 N.C. App. at 351, 780 S.E.2d at 925 (quoting *BG Grp. PLC v. Republic of Argentina*, 572 U.S. 25, 34 (2014)). There is a presumption that "issues of substantive arbitrability . . . are for a court to decide[.]" *Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 85 (2002); *see also Glass v. Kidder Peabody & Co., Inc.*, 114 F.3d 446, 453–54 (4th Cir. 1997) ("It is clear from . . . over thirty years of Supreme Court and federal circuit court precedent that issues of 'substantive arbitrability' are for the court to decide, and questions of 'procedural arbitrability[ ]' . . . are for the arbitrator to decide.").

18. "But 'parties can, and often do, delegate arbitrability to the arbitrator.' " *Cherokee South End, LLC v. PAP Invs. Scaleybark, LLC*, 2018 NCBC LEXIS 106, at \*7 (N.C. Super. Ct. Oct. 12, 2018) (quoting *Charlotte Student Hous. DST v. Choate Constr. Co.*, 2018 NCBC LEXIS 88, at \*8 (N.C. Super. Ct. Aug. 24, 2018)). "Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, . . . the question 'who has the primary power to decide

arbitrability' turns upon what the parties agreed about *that* matter." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995); *see also Henry Schein*, 139 S. Ct. at 527. The presumption that a court will decide issues of substantive arbitrability can be overcome if "there is 'clear and unmistakable' evidence that the parties agreed to 'submit the question of arbitrability to arbitration.'" *Cold Springs Ventures, LLC v. Gilead Scis., Inc.*, 2014 NCBC LEXIS 10, at *9 (N.C. Super. Ct. Mar. 26, 2014) (quoting *First Options*, 514 U.S. at 944–47); *see also Bailey*, 244 N.C. App. at 352–53, 780 S.E.2d at 925 ("A party can overcome this presumption if it shows that the parties 'clearly and unmistakably' intended for an arbitrator, instead of a court, to decide issues of substantive arbitrability.").

19.     Under the FAA, "the parties' express adoption of an arbitral body's rules in their agreement, which delegate questions of substantive arbitrability to the arbitrator, presents clear and unmistakable evidence that the parties intended to arbitrate questions of substantive arbitrability." *Bailey*, 244 N.C. App. at 353, 780 S.E.2d at 926. "'[V]irtually every [federal] circuit to have considered the issue' has held that incorporation of the AAA Rules into an arbitration agreement serves as clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Worldwide Ins. Network*, 2018 NCBC LEXIS 103, at *8–9 (quoting *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1074 (9th Cir. 2013)); *see also Petrofac, Inc. v. DynMcDermott Petro. Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012) (holding "the express adoption of [AAA] rules presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability"); *Fallo v. High-Tech Inst.*, 559 F.3d 874, 878

(8th Cir. 2009) (same); *Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366, 1373 (Fed. Cir. 2006) (same), *abrogated on other grounds by Henry Schein*, 139 S. Ct. 524; *Terminix Int'l v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1332–33 (11th Cir. 2005) (same); *Contec Corp. v. Remote Sol. Co.*, 398 F.3d 205, 208 (2d Cir. 2005) (same).

20.     In this case, "the parties agree[d] that *any dispute* arising out of or relating to the negotiation, award, construction, performance or non-performance, of *any aspect of this agreement*, shall be settled by binding arbitration *in accordance with the Construction Industry Rules of the American Arbitration Association*[.]"  (Class Action Compl. Ex. A ¶ 13 (emphasis added).)  This provision and the AAA Rule it incorporates are nearly identical to the arbitration provision and incorporated AAA Rule the Court of Appeals considered in *Epic Games*: "*Any disputes* between Employee and Epic in *any way concerning . . . this Agreement . . .* shall be submitted . . . to mandatory arbitration before a single arbitrator and conducted *pursuant to the rules of the [AAA]* applicable to the arbitration of employment disputes then in effect[.]"  247 N.C. App. at 62–63, 785 S.E.2d at 143 (emphasis added).  The incorporated rule here (Rule 9(a) of the AAA Construction Rules) and the one in *Epic Games* (Rule 6(a) of the AAA Employment Rules) both provide that "[t]he arbitrator *shall* have the power to rule on *his or her own jurisdiction*, including any objections with respect to the existence, *scope* or validity of the arbitration agreement." (emphasis added).

21.     The Court of Appeals concluded that the provision and incorporated AAA rule in *Epic Games* provided "clear and unmistakable evidence" that the parties had

agreed that an arbitrator would determine issues of substantive arbitrability. 247 N.C. App. at 64, 785 S.E.2d at 144. The Court deems itself bound by that determination, given that the provision and incorporated AAA rule at issue now are nearly identical. As in *Epic Games*, even if the broad language of the Agreement "by itself[ ] does not resolve the issue of whether the parties agreed to arbitrate [issues of substantive] arbitrability, the requirement for arbitration to be conducted pursuant to the AAA rules does." *Id.*; *see also Bailey*, 244 N.C. App. at 355–56, 780 S.E.2d at 927 (holding an agreement incorporating a substantially similar rule indicated parties delegated issues of substantive arbitrability to the arbitrator); *Hall v. Dancy*, 2018 NCBC LEXIS 63, at *8 (N.C. Super. Ct. June 27, 2018) (holding the same for an agreement incorporating a rule with the same language as the AAA Construction Rule); *Cherokee South End, LLC*, 2018 NCBC LEXIS 106, at *8 (same); *AP Atl.*, 2016 NCBC LEXIS 60, at *14–15 (holding the same for an agreement incorporating the same AAA Construction Rule).

C. Class Arbitration

22. The issue for decision on this Motion thus becomes whether the availability of *class* arbitration is an issue of "substantive arbitrability" the parties have agreed an arbitrator must decide or an issue that presumptively remains for the Court. This question has been consistently left open by the United States Supreme Court, *see Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1417 n.4 (2019); *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569–70 n.2 (2013); *Stolt-Nielsen S. A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 678 (2010), although numerous federal circuit courts that

have addressed this question "have concluded that class arbitrability is a gateway issue" that "presumptively must be decided by courts, not arbitrators[,]" *20/20 Communs., Inc. v. Crawford*, 930 F.3d 715, 718 (5th Cir. 2019) (listing cases); *see also Del Webb Cmtys., Inc. v. Carlson*, 817 F.3d 867, 875 (4th Cir. 2016) ("The evolution of the [United States Supreme] Court's cases are but a short step away from the conclusion that whether an arbitration agreement authorizes class arbitration presents a question as to the arbitrator's inherent power, which requires judicial review.").

23.    In determining whether the availability of class arbitration is an issue of substantive arbitrability, courts have focused on the "significant distinctions between class and bilateral arbitration[.]" *Del Webb Cmtys.*, 817 F.3d at 875; *see also Lamps Plus*, 139 S. Ct. at 1416 ("[I]t is important to recognize the 'fundamental' difference between class arbitration and the individualized form of arbitration envisioned by the FAA."). While "[i]n individual arbitration, 'parties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes[,]' " *Lamps Plus*, 139 S. Ct. at 1416 (quoting *Stolt-Nielsen*, 559 U.S. at 685), class arbitration does not allow for those same benefits. "[Class arbitration] 'sacrifices the principal advantage of arbitration— its informality—and makes the process slower, more costly, and more likely to generate procedural morass than final judgment.' " *Id.* (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 348 (2011)); *see also Del Webb Cmtys.*, 817 F.3d at 876

(observing that in class arbitration, "the arbitrator must determine, before ruling on the merits, whether to certify the class, whether the named parties satisfy mandatory standards of representation and commonality, how discovery will function, and how to bind absent class members"). "Class arbitration not only 'introduce[s] new risks and costs for both sides[ ]' . . . [but] also raises serious due process concerns by adjudicating the rights of absent members of the plaintiff class . . . with only limited judicial review." *Lamps Plus*, 139 S. Ct. at 1416 (quoting *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1623 (2018)); *see also Del Webb Cmtys.*, 817 F.3d at 875 ("The FAA, however, provides very limited grounds for vacating an arbitration award. . . . As a result, '[t]he absence of multilayered review' in arbitration 'makes it more likely that errors will go uncorrected.' " (quoting *Concepcion*, 563 U.S. at 350)).

24. Due to these fundamental differences, the United States Supreme Court has made clear that "a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so." *Stolt-Nielsen*, 559 U.S. at 684. In particular, "[a]lthough parties are free to authorize arbitrators to resolve [gateway] questions, [a court] will not conclude that they have done so based on 'silence *or* ambiguity' in their agreement, because 'doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide.' " *Lamps Plus*, 139 S. Ct. at 1417 (quoting *First Options*, 514 U.S. at 945). Moreover, "courts may not rely on state contract principles to 'reshape traditional individualized arbitration by mandating

classwide arbitration procedures without the parties' consent.'" *Id.* at 1418 (quoting *Epic Sys. Corp.*, 138 S. Ct. at 1623).

25. Although recognizing that the Supreme Court has not addressed whether the court or an arbitrator should determine the availability of class arbitration under an arbitration agreement, Defendant contends that "the threshold question involving an arbitrator's inherent power to preside over an unknown and widespread class of parties . . . is such a fundamental and significant departure from individualized arbitration that" an incorporation of the AAA Construction Rules in the parties' Agreement, without more, cannot constitute clear and unmistakable evidence that the parties agreed for an arbitrator to decide the availability of class arbitration. (Def.'s Suppl. Br. Supp. Mot. Dismiss or, Alternative, Compel Bilateral Arbitration & Stay Proceedings 14, ECF No. 26.)  In contrast, Plaintiffs argue that under *Epic Games*, the Court must conclude that the Agreement and its incorporation of the AAA Construction Rules "clearly and unmistakably evidence[ ] the parties' intention to have the arbitrator . . . decide substantive issues, including class arbitrability." (Pls.' Suppl. Br. Opp'n Def.'s Mot. Dismiss or, Alternative, Compel Bilateral Arbitration & Stay Proceedings 3, ECF No. 27.)

26. The North Carolina courts have not addressed whether a court or an arbitrator should decide whether class arbitration is available under an arbitration agreement, and the federal circuit courts have split in answering that question.

27. The Second, Fifth, Tenth, and Eleventh Circuits have concluded that an agreement's incorporation of AAA rules of the type in the Agreement here constitutes

"clear and unmistakable evidence" of the parties' intent to delegate the issue of the availability of class arbitration to the arbitrator: see *Wells Fargo Advisors, LLC v. Sappington*, 884 F.3d 392, 397 (2d Cir. 2018) (holding that incorporation of AAA rules without more demonstrates "clear and unmistakable" intent for arbitrator to decide arbitrability of class claims); *Reed v. Fla. Metro. Univ., Inc.*, 681 F.3d 630, 635–36 (5th Cir. 2012) (holding that "agreement to AAA's Commercial Rules also constitutes . . . a clear agreement to allow the arbitrator to decide whether the party's agreement provides for class arbitration"), *abrogated on other grounds by Sutter*, 569 U.S. 564; *Dish Network L.L.C. v. Ray*, 900 F.3d 1240, 1245–48 (10th Cir. 2018) (holding that an agreement incorporating AAA rules "provides clear and unambiguous evidence that the parties intended to delegate *all* issues of arbitrability to the arbitrator[,]" including class arbitrability (emphasis in original)); *JPay, Inc. v. Kobel*, 904 F.3d 923, 936–38 (11th Cir. 2018) (holding incorporation of AAA rules "clearly and unmistakably give[s] the arbitrator power to rule on his own jurisdiction, thus delegating questions of arbitrability [of class claims] to the arbitrator"). In these circuits, "if the arbitration agreement delegates *all* questions of arbitrability to the arbitrator, the issue [of class availability] is for the arbitrator, not the court." *Fannie Mae v. Prowant*, 209 F. Supp. 3d 1295, 1311 (N.D. Ga. 2016) (emphasis in original).

28. The Third, Sixth, and Eighth Circuits have held otherwise, concluding that specific contractual language, rather than broad AAA Rule incorporation, is necessary to delegate a determination of the availability of class arbitration to an arbitrator: see *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746,

763 (3d Cir. 2016) (declining to defer class arbitrability to arbitrator where arbitration agreement lacked "express contractual language unambiguously delegating the question of class arbitrability to the arbitrators" (citation omitted)); *Reed Elsevier, Inc. v. Crockett*, 734 F.3d 594, 599 (6th Cir. 2013) (declining to defer to arbitrator where there was a "total absence of any reference to classwide arbitration in [the arbitration] clause" because "the agreement . . . can just as easily be read to speak only to issues related to bilateral arbitration" and thus is "silent or ambiguous as to whether an arbitrator should determine the question of classwide arbitrability"); *Catamaran Corp. v. Towncrest Pharmacy*, 864 F.3d 966, 973 (8th Cir. 2017) (holding that "a more particular delegation of the [class arbitration availability] issue than we may otherwise deem sufficient in bilateral disputes" is necessary). In these circuits, "to 'clearly and unmistakably' delegate class availability to an arbitrator, the agreement must provide specific language to that effect, for example, 'all issues of arbitrability, including whether the agreement provides for class claims, shall be decided by the arbitrator.' " *Fannie Mae*, 209 F. Supp. 3d at 1311.[1]

29. The fundamental issue for the Court, therefore, is whether there is clear and unmistakable evidence that the parties agreed that an arbitrator would decide whether the parties agreed to class arbitration under the Agreement.

---

[1] Although the parties each claim that the Fourth Circuit's decision in *Del Webb Cmtys.* favors their preferred rule, the Court agrees with the Central District of California that "the Fourth Circuit in *Dell* [sic] *Webb Communities* . . . did not directly address th[e] issue" of "whether incorporation of the AAA's model rules is sufficient to delegate the question of whether class-wide arbitration is permissible to an arbitrator." *Guess?, Inc. v. Russell*, No. 2:16-cv-00780-CAS(ASx), 2016 U.S. Dist. LEXIS 53765, at *15 (C.D. Cal. Apr. 18, 2016).

30. Here, the parties specifically agreed that "any dispute arising out of or relating to the negotiation, award, construction, performance or non-performance, of any aspect of this agreement shall be settled by binding arbitration in accordance with the Construction Industry Rules of the American Arbitration Association[,]" (Class Action Compl. Ex. A ¶ 13), and Rule 9(a) of the AAA Construction Rules specifically provides that "the arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the . . . *scope* . . . of the arbitration agreement[,]" (emphasis added).

31. "Although the AAA rules do not contain class arbitration procedures, such procedures are provided for in the Supplementary Rules for Class Arbitration ['Supplementary Rules'], which were enacted in October 2003." *Chesapeake Appalachia, LLC v. Burkett*, No. 3:13-3073, 2014 U.S. Dist. LEXIS 148442, at *16 (M.D. Pa. Oct. 17, 2014). "By their terms, the Supplementary Rules apply 'to any dispute arising out of an agreement that provides for arbitration pursuant to any of the rules of the [AAA] where a party submits a dispute to arbitration on behalf of or against a class or purported class, and shall supplement any other applicable AAA rules.' " *Id.* (quoting AAA Supplementary Rule 1(a)); *see also Reed*, 681 F.3d at 635 (concluding that "the parties' agreement to the AAA's Commercial Rules also constitutes consent to the Supplementary Rules"). Of particular relevance here, Supplementary Rule 3 states that "the arbitrator shall determine as a threshold matter, in a reasoned, partial final award on the construction of the arbitration

clause, whether the applicable arbitration clause permits the arbitration to proceed on behalf of or against a class[.]"

32.     *Epic Games* and its progeny make clear that the parties' incorporation of the AAA Rules into the Agreement constitutes clear and unmistakable evidence that the parties agreed to delegate issues of "substantive arbitrability," including issues of existence, scope, or validity of the Agreement, to the arbitrator.  *See, e.g., Hall*, 2018 NCBC LEXIS 63, at *6–7 ("Under either the FAA or the North Carolina Act, when the parties' arbitration agreement specifically incorporates the [AAA] rules, such incorporation demonstrates that the parties clearly and unmistakably intended for the arbitrator to resolve disputes [of substantive] arbitrability."); *see also Bailey*, 244 N.C. App. at 355, 780 S.E.2d at 927 (concluding that the parties' express adoption of an arbitral body's rules constitutes clear and unmistakable evidence that the parties intended to arbitrate questions of substantive arbitrability).

33.     The question thus is whether the parties' agreement, through the incorporation of the AAA Construction Rules (and by that incorporation, the Supplementary Rules), that an arbitrator would decide the "scope" of the arbitration proceeding constitutes an agreement that the arbitrator would determine whether class arbitration is available in that proceeding.  Giving the word "scope" its plain and ordinary meaning and considering it in the context in which it is used in the AAA Rules, the Court concludes that it does.  Other courts have agreed.  *See, e.g., JPay*, 904 F.3d at 931 ("Formally, the question whether class arbitration is available will determine the scope of the arbitration proceedings."); *Reed*, 681 F.3d at 635–36 ("The

parties' consent to the Supplementary Rules . . . constitutes a clear agreement to allow the arbitrator to decide whether the party's agreement provides for class arbitration."); *Burkett*, 2014 U.S. Dist. LEXIS 148442, at *22 (holding that a rule vesting an arbitrator with authority to decide the scope of his or her own jurisdiction includes "the issue of 'who decides' class arbitrability").

34. Accordingly, since the Court concludes that a determination of the availability of class arbitration necessarily involves a determination of the scope of the arbitration, the Court further concludes that the parties here clearly and unmistakably agreed in the Agreement that this determination is for the arbitrator rather than the Court. *See, e.g.*, *Awuah v. Coverall N. Am., Inc.*, 554 F.3d 7, 11 (1st Cir. 2009) (holding that a rule providing that an arbitrator may " 'rule on his or her own jurisdiction' including any objection to the 'existence, scope or validity of the arbitration agreement[ ]' . . . is about as 'clear and unmistakable' as language can get[.]"); *Hedrick v. BNC Nat'l Bank*, 186 F. Supp. 3d 1189, 1196 (D. Kan. 2016) ("These Rules state that 'The Arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.' Thus, . . . the arbitrator must determine whether class arbitration falls within the *scope* of the clause." (emphasis added)).[2]

---

[2] Although applying the FAA here, the Court concludes that the ruling on Defendant's Motion would be the same under either the FAA or the NCRUAA because, like in *Epic Games,* "[u]nder either law, the plain language of the arbitration clause, properly interpreted, delegates . . . threshold issue[s] of substantive arbitrability to the arbitrator - not to the trial court." 247 N.C. App. at 61, 785 S.E.2d at 142.

35. In light of the foregoing, the Court does not address Defendant's contention that the arbitration agreement does not permit class arbitration. *See, e.g.*, *Henry Schein*, 139 S. Ct. at 531 ("When the parties' contract delegates [a] question to an arbitrator, the courts must respect the parties' decision as embodied in the contract" and should not "confuse[ ] the question of who decides . . . with the separate question of who prevails[.]"); *Robinson v. J & K Admin. Mgmt. Servs.*, 817 F.3d 193, 198 (5th Cir. 2016) ("[Defendant] may be right that the agreement does not allow class or collective arbitration, but that is not the issue before the court. The issue is who decides if the arbitration agreement permits class or collective procedures.").

## III.

## CONCLUSION

36. **WHEREFORE**, for the reasons set forth above, the Court hereby **DENIES** Defendant's Motion, and **ORDERS** as follows:

    a. Plaintiffs' claims asserted in this action are hereby **ORDERED** to arbitration, the determination of whether class arbitration is available is **DEFERRED** to a properly selected arbitrator, and the litigation of all claims in this civil action is hereby **STAYED** pending the outcome of the arbitration proceedings between the parties.

    b. The parties shall notify the Court of the outcome of the arbitration proceedings within seven days after the arbitrator has issued his or her decision. Plaintiff shall submits to the Court a copy of the arbitrator's

decision accompanied by the parties' recommendations concerning further proceedings, if any, in this Court.

**SO ORDERED**, this the 20th day of December, 2019.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Chief Business Court Judge